UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


AIR LINE PILOTS ASSOCIATION
INTERNATIONAL,

       Plaintiff,

v.                                                          Case No.  08-CV-13785

SPIRIT AIRLINES, INC.                        HONORABLE AVERN COHN

       Defendant.

_____/

**<u>MEMORANDUM AND ORDER</u>**
**<u>GRANTING SPIRIT AIRLINES, INC.'S RULE 12(b)(6)</u>**
**<u>MOTION TO DISMISS WITHOUT PREJUDICE</u>**

## TABLE OF CONTENTS

I.  INTRODUCTION.................................................................................................3

II. BACKGROUND...............................................................................................  4
    A. The Spirit-ALPA Collective Bargaining Agreement ........................................  4
    B. Spirit Unilaterally Implements Five Policy Changes ......................................  4
    C. The September 2008 Bargaining Session .....................................................  7
    D. The October 2008 Bargaining Session .........................................................  9
    E.  Spirit's Comments to the Media ..................................................................  9
    F. The January 2009 Bargaining Session .........................................................  10
III. PROCEDURAL HISTORY .......................................................................................  11

IV. THE RLA.......................................................................................................12
    A.  General Framework.......................................................................................12
    B.  The National Mediation Board.........................................................................13

V.  SPIRIT'S RULE 12(b)(6) MOTION ........................................................................13
    A.  Legal Standard ..........................................................................................  13
    B.  Discussion ................................................................................................  14
        1. Count One - Breach of Duty of Good Faith Bargaining ....................  14
            i.  Law .............................................................................................  14
            ii. The Parties' Argument ...................................................................  21
                a. ALPA's Position...... .......................................................  21
                b.  Spirit's Response ........................................................  22
                c.  ALPA's Counter Arguments ........................................  24
            iii. Resolution..................................................................................  26
                a. Spirit's Regressive Proposals .....................................  26
                b. Withdrawal of Tentative Agreements .........................  27
                 c. The January 2009 Proposal and Spirit's Purported
                    "Unpalatable" Demands ...............................................  28
        2. Count Two - Violation of ALPA's Organizational Rights .................  30
            i.  Law .............................................................................................  30
            ii. The Parties' Arguments.............................................................  32
            iii. Resolution ...............................................................................33

VI. ORDER .....................................................................................................34

I.   Introduction

This is a labor case brought under the Railway Labor Act ("RLA") by Air Line Pilots Association International ("ALPA") against Spirit Airlines, Inc. ("Spirit").  Spirit is a common air carrier engaged in the business of providing cargo and passenger air transportation to the public.  ALPA is a labor organization representing Spirit pilots.

ALPA seeks an order from this Court compelling Spirit to:

> (1) bargain in good faith with ALPA, (2) cease interfering with and coercing Spirit pilots with respect to the exercise of their organizational rights, and (3) cease from its efforts to undermine and destroy ALPA's standing, effectiveness and functioning as the pilots' lawfully-elected, exclusive representative, through a continuing pattern and practice of illegal conduct.

Consolidated Second Amended Complaint ("SAC") at ¶ 1.[1]

---

[1] Specifically, ALPA's proposed order reads as follows:

1. **IT IS HEREBY ORDERED AND ADJUDGED** that Judgment be entered in favor of [ALPA] against . . . Spirit . . . and that . . . . Spirit's motion to dismiss is denied.

2. **IT IS HEREBY ORDERED AND ADJUDGED** that . . . Spirit violated its duty under . . . 45 U.S.C. § 152, First, to "make every reasonable effort to make and maintain agreements" with . . . ALPA . . .

3. **IT IS HEREBY ORDERED AND ADJUDGED** that . . . Spirit is directed, until the parties reach an agreement or are released from further federally-mediated negotiations by the National Meditation Board, from:

    a) Withdrawing, without cause and explanation, from any tentative agreements entered into with ALPA since the commencement of the current . . . 45 U.S.C. § 156 bargaining; and

    b) Submitting, without cause and explanation, contract proposals to ALPA that regress from current working conditions embodied in the parties' current collective bargaining agreement or from proposals previously made by Spirit since the commencement

Now before the Court is Spirit's FED. R. CIV. P. 12(b)(6) motion. The Court heard oral argument on this matter on June 3, 2009. For the reasons that follow, the Court will grant Spirit's motion and dismiss this case without prejudice.

## II.  Background[2]

### A.  The Spirit-ALPA Collective Bargaining Agreement ("CBA")

ALPA and Spirit are parties to a CBA governing the employment of Spirit pilots. The CBA became effective on January 31, 2003, and amendable (i.e., open for negotiation) on January 31, 2007. The parties began negotiating for a successor agreement pursuant to the RLA in October 2006 and these negotiations, which are currently under the jurisdiction of the National Mediation Board ("NMB") and overseen by a federal mediator, remain ongoing today.

### B.  Spirit Unilaterally Implements Five Policy Changes

During the course of federally-mediated bargaining for a new CBA, Spirit unilaterally implemented five changes to company policy, all of which adversely affect Spirit pilots.

---

of current . . . 45 U.S.C. § 156 bargaining.

4. **IT IS FURTHER ORDERED** that . . . Spirit is directed to: (a) bargain in good faith with ALPA; (b) exert every reasonable effort to make and maintain agreements with ALPA; (c) refrain from engaging in conduct designed to improperly forestall an agreement with ALPA; and (d) to immediately cease and desist from conduct that undermines the collective bargaining process and ALPA . . . in the current negotiations between the parties.

(emphasis in original).

[2] The background is gleaned from ALPA's SAC. The factual allegations in the SAC are taken as true for purposes of this motion. See Marks v. Newcourt Credit Group, Inc., 342 F.3d 444, 451-452 (6th Cir. 2003).

4

### 1. Redefinition of "Block Out Time"

The first policy change unilaterally implemented by Spirit reduced pilot pay by redefining "block out time."  See SAC at ¶¶ 13-22.  "'Block out time' is the point in time when pilots begin to receive their flight pay."  Id. at ¶ 13.  As explained by ALPA,

> 13.    On May 27, 2008, [Spirit] announced that, effective June 1, 2008, it was unilaterally imposing a new definition of "block out time," without any basis in the CBA or precedent in past practice . . . .  Over the course of more than a decade, the parties have agreed, and the unbroken practice has been, to define "block out time" – and the beginning of the pilots' hourly pay clock – as when the aircraft's cabin door is closed and the parking break is released.

> 14.    In its May 27, notice to pilots, [Spirit] advised that, effective June 1, "block out time" would be redefined as when the aircraft reached a speed of 0.5 knots during roll out.

SAC at ¶¶ 13-14.  ALPA describes the practical implications of the policy change as follows:

> 15.    In some more congested airports, such as LaGuardia, it is not uncommon for 20 minutes or more to elapse between when the cabin door is closed and the parking break is released, and when the aircraft first reaches a roll speed of 0.5 knots.  By defining "block out time" as when the aircraft rolls at 0.5 knots, [Spirit] is effectively docking pilots up to a third of an hour's pay, or more, for each flight segment.

Id. at ¶ 15.

### 2. Discontinuation of Reimbursement for Training-Related Expenses

As its second policy change, Spirit discontinued the practice of reimbursing pilots for training-related expenses effective July 1, 2008.  See id. at ¶¶ 23-27.  As explained by ALPA,

> 23.    On May 30, 2008, [Spirit] informed ALPA that is was considering no longer paying pilots per diem, lodging and

5

> transportation expenses incurred in connection with training events at Spirit's headquarters in Miramar, Florida and at the Airbus training facility in Miami, Florida.
>
> 24. Under the CBA, [Spirit] is required to reimburse pilots for per diem, lodging and transportation expenses incurred on Company business away from the pilot's domicile . . . .
>
> * * * *
>
> 27. Despite the clear contractual prohibitions and over ALPA's strenuous objections, [Spirit] informed [an ALPA official] on June 25, that, effective July 1, [Spirit] would no longer pay pilots' training-related . . . expenses . . . .

SAC at ¶¶ 23-24, 27.

### 3. Abrogation of the "Four Day Off" Rule

The third policy change unilaterally implemented by Spirit abrogated what is known in the industry as the "four day off" rule. See id. at ¶¶ 28-39. The four day off rule provides pilots with "protection for at least four consecutive days off between trips." Id. at ¶ 28. As explained by ALPA,

> 30. For many Spirit pilots, contractual protection for blocks of at least four consecutive days off is the difference between working conditions that enable them to preserve, if barely, a semblance of normal family life and working conditions that would be devastating to family life . . . .
>
> * * * *
>
> 33. On July 9, 2008 . . . [Spirit] informed ALPA that, starting with the bid package for August 2008, it no longer would adhere to the "four day off" rule . . . .

SAC at ¶¶ 30, 33.

### 4. Doctor's Note Requirement

Fourth, Spirit implemented a policy requiring a doctor's note from all pilots who call

6

in sick.  See id. at ¶¶ 40-56.  As explained by ALPA,

> 48.  The CBA prohibits [Spirit] from requiring a doctor's note from a pilot using accrued sick leave, unless "there is a reasonable basis to question the pilot's use of sick leave."  CBA Section 14.F.4.  If such a reasonable basis exists, the CBA specifies that "a member of Flight Operations management may require a pilot to furnish [Spirit] with a physician's certificate describing the sickness or injury."  Id.

> 49.  Currently, [Spirit] is requiring a doctor's note from all pilots who call in sick.  This blanket practice is a clear violation of the CBA's requirement that there first be "a reasonable basis to question the pilot's use of sick leave" before [Spirit] is permitted to "require a pilot to furnish [Spirit] with a physician's certificate."

SAC at ¶¶ 48-49.

5.  Requirement of Pilots to Continue Flying Past Their Furlough Effective Date

The parties' CBA guarantees minimum monthly compensation for any pilot flying any portion of a month.  Spirit published a bid package requiring pilots with September 1, 2008, furlough effective dates to fly until September 4, 2008, without paying those pilots the minimum monthly compensation to which they believe they are entitled under the CBA.

C.   The September 2008 Bargaining Session

On September 18, 2008, the parties convened a federally-mediated negotiating session for a new CBA under the supervision of Kane.  See id. at ¶¶ 64-87.  Spirit made its first substantive economic proposal during this session ("September Proposal").  ALPA says that Spirit's September Proposal presented bargaining positions that were "regressive beyond anything previously discussed between the parties," see id. at p. 22, and consequently, evinces bad faith bargaining. The details surrounding Spirit's September Proposal, as described by ALPA, are as follows:

7

65.    The September Proposal withdrew agreement from all previous TAs [tentative agreements] including those limited to contract administration and other non-economic issues.

66.    The September Proposal eliminated substantially all restrictions on how pilots could be scheduled or hours of service beyond those required by law.

67.    The September Proposal eliminated or drastically reduced pay guarantees and provisions for premium pay for overtime flying.

68.    The September Proposal substantially increased pilot contributions for medical coverage.

69.    The September Proposal reduced [Spirit's] match to the pilot contributions to the Company sponsored 401(k) plan by close to two-thirds.

70.    The September Proposal significantly reduced sick leave and vacation accrual.

SAC at ¶¶ 65-70.

At the start of the September bargaining session, Spirit said that its September Proposal would increase pilot compensation, but ALPA says it did not. In sum, ALPA says that the implementation of the terms contained in the September Proposal would result in "a cut of at least 13.1% in total pilot compensation and take-home pay," see id. at ¶ 76, despite Spirit's promise that it would "increase pilot compensation in exchange for the elimination of certain contractual restrictions that [Spirit] believed hindered productivity," see id. at ¶ 72. On September 19, 2008, Spirit admitted what it denied the day before: that its September Proposal contained a cut – not a raise – in total compensation for pilots. See id. at ¶ 80.

Spirit blamed the its September Proposal entirely on the increasing cost of fuel. See id. at ¶¶ 84, 87.

8

After examining the terms of the September Proposal, ALPA informed Spirit that "it did not view the September Proposal as a good faith attempt to bring about agreement." See id. at ¶ 88.  According to ALPA,

> 89. [Spirit] responded by saying that the concessions were necessary in light of the increases in the price of fuel and . . . in the view of Spirit's Chief Executive Officer . . . union contracts covering pilots were outmoded and . . . the contracts of the future would have to meet [the Chief Executive Officer's] vision of unrestricted access to pilots with few, if any, pay guarantees.

> 90. [Spirit] further stated that it needed this sort of agreement to attract investors, although, when asked, [Spirit's] representatives could not tell the ALPA Bargaining Committee whether, if ALPA acquiesced to their proposal, it would materially impact the decisions of prospective investors.

SAC at ¶¶ 89-90.  Spirit also "made clear it was not prepared to negotiate any form of arrangement that departed significantly from the September Proposal . . . ."  Id. at ¶ 92.

### D.   The October 2008 Bargaining Session

The parties held another bargaining session on October 28-29, 2008, under the supervision of the mediator.  See id. at ¶¶ 93-100.  Despite the fact that, according to the SAC, the price of fuel dropped by 34% (from $93 to $61) between the September and October bargaining sessions, Spirit "refused to adjust the cost-savings it had demanded in its September Proposal or revise the fuel price assumption in its 2009 Business Plan to reflect" the substantial decrease in the cost of fuel.  See id. at ¶¶ 94-95, 98.

### E.   Spirit's Comments to the Media

In December 2008, Spirit told Aviation Daily, a leading trade daily for the airline industry, that it was "doing well" in the current economic environment and that "lower fuel costs . . . disproportionately benefit Spirit . . . ."  See id. at ¶ 101.

9

F.   The January 2009 Bargaining Session

Another bargaining session between the parties was held on January 20, 2009, at

which Spirit presented a new proposal to ALPA (the "January 2009 Proposal").  See id. at

¶¶ 103-104.  Spirit's January 2009 Proposal demanded greater concessions from the pilots

than those demanded during the September 2008 bargaining session.  As stated by ALPA,

> 105.   The January Proposal renounced every [tentative agreement]
> previously reached by the parties over the past 30 months of
> bargaining, except those dealing with union dues and Political
> Action Committee check-off. Nevertheless, [Spirit] insisted that,
> while it would bargain over its proposal, the January 20
> proposal had to be the basis for any agreement.

Id. at ¶ 105.  Three of the tentative agreements renounced by Spirit at the January 2009

bargaining session were as follows:

> 113.   The parties' present [CBA] states that a pilot "will not be
> disciplined without just cause" . . . . The January [2009]
> Proposal, however, . . . seeks to replace [this language] with a
> provision that states that ". . . [Spirit] may in its discretion
> discipline or discharge a pilot for just cause."  (Emphasis
> added.)  Spirit provided no justification at the January [2009]
> meeting for this abandonment . . . and departure from the
> industry-standard just cause provision of the CBA.

> 114.   The January Proposal changes the Workers' Compensation
> provision of the CBA to specify that a pilot is entitled to
> worker's compensation benefits "so long as he is  unable to
> perform in "any" job as opposed to his "own" job as a pilot . . .
> . Spirit provided no justification for this proposal.

> 115.   The January Proposal gives [Spirit] the right to deny Captain
> upgrades to pilots entitled to such positions . . . if the
> Company-chosen Chief Pilot questions the pilots [sic]
> leadership, competency, or reliability. This proposal to provide
> such unfettered management discretion with regard to Captain
> upgrades is not contained in any pilot agreement of which
> ALPA is aware . . . . Spirit provided no justification for this
> proposal.

10

Id. at ¶¶ 113-115.  ALPA says that these changes "are only three of many demands made by [Spirit]" and that many of the changes proposed "concern non-economic provisions of the contract that had previously been the subject of [tentative agreements] by the parties."  See id. at ¶ 117.

All in all,

> [Spirit] stated the January Proposal contained concessions from its ALPA-represented pilots valued at $5.8 million annually over the term of the contract, a $1.3 million increase from the $4.5 million in annual concessions contained in the proposal made by [Spirit during the September Proposal].

Id. at ¶ 106.  ALPA says that the $5.8 million figure "underestimates the total cost-savings in the January Proposal."  See id. at ¶ 107.  Spirit also says that Spirit "provided no explanation [at the January 20 bargaining session] for why it was demanding additional concessions, except for general references to the state of the national economy and of the economy in Michigan and Florida."  See id. at ¶ 108.

The mediator informed the parties at the conclusion of the January 2009 bargaining session that Spirit's January 2009 Proposal "was not the basis for an agreement."  See id. at ¶ 119.

### III.   Procedural History

ALPA filed its initial Complaint on September 3, 2008.  Spirit filed its motion to dismiss for lack of subject matter jurisdiction on November 3, 2008.  ALPA filed its Amended Complaint on January 22, 2009, and its SAC on February 9, 2009.[3]  On February

---

[3] The SAC is the governing complaint in this action.  Thus, as will be discussed later in the Memorandum, Spirit's Rule 12(b)(1) motion is directed at a complaint that no longer exists.

11

23, 2009, Spirit filed a motion to dismiss ALPA's SAC for failure to state a claim upon which

relief can be granted.

## IV.   The RLA

### A.   General Framework

The Sixth Circuit has succinctly discussed the purpose and scope of the RLA as

follows:

> One of the purposes of the RLA is "[t]o avoid any interruption to commerce or to the operation of any [air or rail] carrier engaged therein."  To that end, the RLA provides mandatory procedures for resolving disputes between carriers and unions.  For purposes of determining which of the RLA's procedures are to be followed in resolving such disputes, the courts have classified those disputes as either "major" or "minor."  Major disputes are defined as disputes "over the formation of collective agreements or efforts to secure them.  They arise where there is no such agreement or where it is sought to change the terms of one . . ."  See also ABX Air, Inc. v. Airline Professionals Assoc., 266 F.3d 392, 396 (6th Cir. 2001) ("ABX I") ("Major disputes involve disagreements over the creation of contractual rights during bargaining for a CBA or to change the terms of an existing agreement.").  Minor disputes, on the other hand, can be resolved by interpreting the terms of the CBA.  Stated differently, major disputes seek to create contractual rights; minor disputes seek to enforce them.
>
> When a major dispute occurs, the parties must engage in the lengthy process of bargaining and mediation set out in . . . 45 U.S.C. §§ 155 and 156.  During that process, the parties must maintain the "status quo," and the employer is prohibited from implementing the contested changes in working conditions.  The district courts have subject matter jurisdiction to enjoin a violation of the status quo pending the exhaustion of the required procedural remedies.
>
> Minor disputes, by contrast, must first be resolved through the normal grievance procedure.  We held in ABX I that
>
> > [i]f discussions fail to yield a solution, both parties are subject to compulsory and binding arbitration before an adjustment board under 45 U.S.C. § 152, Sixth and § 184.  While the courts have no jurisdiction to resolve the

12

> substance of minor disputes, they can enjoin strikes
> over minor disputes in order to enforce compliance with
> the RLA's dispute resolution provisions.

Airline Prof'ls Ass'n, Teamster Local Union 1224 v. ABX Air, Inc., 400 F.3d 411, 413-414

(6th Cir. 2005) (citations omitted).

### B.   The NMB

Currently, the parties are involved in mediation before the NMB. "The [NMB] is the

federal agency created by the RLA to administer certain functions under the [RLA]."

INDEPENDENT PILOTS ASSOCIATION, BARGAINING UNDER THE RAILWAY LABOR ACT (2004),

http://www.ipapilot.org/media/rla.pdf.   Among other things, the NMB "is primarily

responsible for . . . (2) supervising the mediation of contract negotiations." Id. "The role

of the mediator is to assist the parties with productive dialog on their issues." Id.

> There is no time limit for the mediation process. It can take just a few
> meetings, or several months, depending upon the complexity of the
> negotiations and many other factors unique to each contract
> negotiation. The NMB has the authority to decide when, and if, to end
> mediation. Under the RLA, the NMB ceases mediation efforts when
> it concludes that all reasonable efforts to reach a voluntary agreement
> through mediation have failed.

Id.

### V.   Spirit's Rule 12(b)(6) Motion

### A.   Legal Standard

The standard under FED. R. CIV. P. 12(b)(6) has recently been summarized by the

Sixth Circuit as follows:

> In deciding a Rule 12(b)(6) motion, a district court must (1) view
> the complaint in the light most favorable to the plaintiff and (2) take all
> well-pleaded factual allegations as true. But the district court need not
> accept a "bare assertion of legal conclusions."

13

> In Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1974, 1965, 167 L.Ed.2d 929 (2007), the Supreme Court said that, when viewing the complaint under the above standards, to survive a motion to dismiss a complaint must contain (1) "enough facts to state a claim to relief that is plausible," (2) more than "a formulaic recitation of a cause of action's elements," and (3) allegations that suggest a "right to relief above a speculative level."

Tackett v. M&G Polymers, USA, LLC, 561 F.3d 478, 488 (6th Cir. 2009) (citations omitted).

### B.    Discussion

ALPA's SAC contains two counts.  In Count One, ALPA claims that Spirit breached its duty to bargain in good faith under 45 U.S.C. § 152, First.  In Count Two, ALPA claims that Spirit violated the right of its pilots to organize under 45 U.S.C. § 152, Third and Fourth.  Spirit requests that both counts be dismissed pursuant to FED. R. CIV. P. 12(b)(6).  The Court addresses each count, in turn, below.

### 1.    Count One - Breach of Duty of Good Faith Bargaining

#### i.    Law[4]

The duty to bargain in good faith is codified at 45 U.S.C. § 152, First, which imposes a general duty upon all carriers to

> exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

---

[4] Throughout this Section, the Court occasionally cites cases interpreting the National Labor Relations Act ("NLRA") for assistance in construing the RLA.  This practice that has been authorized by the Supreme Court.  See, e.g., Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants, 489 U.S. 426, 446 (1989) (Brennan, J., dissenting); Bhd. of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 383 (1969).

14

The duty to "exert every reasonable effort to make and maintain agreements" is "more than a mere statement of policy or exhortation to the parties; rather, it was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis." Chicago & N. W. Ry. Co. v. United Transp. Union, 402 U.S. 570, 577 (1971). "[T]he obligation under [§ 152, First] is central to the effective working of the [RLA]." Id. at 578.

A court must be extremely careful, however, not to unduly interfere with the negotiations between the parties, as there is a "strong federal labor policy against governmental interference with the substantive terms of collective bargaining agreements." See id. at 579 n.11. Thus, in analyzing a claim under § 152, First, the Court's inquiry is twofold. First, "the initial inquiry is whether the parties have complied 'with the formal procedures' of the RLA by meeting and exchanging proposals." Ass'n of Flight Attendants, AFL-CIO v. Horizon Air Indus., Inc., 976 F.2d 541, 545 (9th Cir. 1992) (quoting Chicago & N. W. Ry., 402 U.S. at 578). In other words, "the duty imposed by the RLA to exert every reasonable effort to reach an agreement 'at least requires the employer to meet and confer with the authorized representative of its employees, to listen to their complaints, to make reasonable effort to compose differences.'" Id. (quoting Virginian Ry. Co. v. Sys. Fed'n No. 40, Ry. Employees Dep't, AFL, 300 U.S. 515, 548 (1937)). Refusal of a party to at least meet, confer, and exchange proposals with the other, then, will result in a violation of § 152, First.

However, fulfillment of the duty under § 152, First to bargain in good faith requires more than merely meeting, conferring, and exchanging proposals. As stated by the Supreme Court,

> "[i]t [is] not enough for the law to compel the parties to meet and treat without passing judgment upon the quality of the negotiations. The bargaining status of a union can be destroyed by going through the motions of negotiating almost as easily as by bluntly withholding recognition."

Chicago & N. W. Ry., 402 U.S. at 575 (quoting Archibald Cox, The Duty to Bargain in Good Faith, 71 HARV. L. REV. 1401, 1412-13 (1958)).  Therefore, a party may be liable under the RLA if it "goes through the motions with 'a desire not to reach an agreement.'"  Id. at 578 (quoting Nat'l Labor Relations Bd. v. Reed & Prince Mfg. Co., 205 F.2d 131, 134 (1st Cir. 1953)).  In other words, a party violates § 152, First when it negotiates in bad faith.  See Am. Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 169 F. Supp. 777, 794 (S.D.N.Y.1958) ("[t]he requirement of good faith bargaining is really a requirement of absence of bad faith").

Several rules guide the Court's analysis.  First, "[t]he question of subjective intent may be ruled from evidence presented, including any 'conduct clearly showing a wish to defeat rather than to reach agreement.'"  Indep. Fed'n of Flight Attendants v. Trans World Airlines, 682 F. Supp. 1003, 1020 (W.D. Mo. 1988) (quoting Am. Airlines, 169 F. Supp. at 795).  See also Ry. Labor Executives' Ass'n v. Boston and Maine Corp., 664 F. Supp. 605, 615 (D. Me. 1987) (analyzing a bad faith bargaining claim under the RLA "requires the Court to evaluate the totality of the [parties'] conduct since bad faith must usually be inferred from circumstantial evidence").  For example, "[a]n egregiously one-sided 'proposed contract' may have some evidentiary value in appraising the intent of a party." Trans World Airlines, 682 F. Supp. at 1027 (quoting Soule Glass & Glazing Co. v. Nat'l Labor Relations Bd., 652 F.2d 1055, 1104 (1st Cir. 1981), abrogated on other grounds by Nat'l Labor Relations Bd. v. Curtin Matheson Scientific, Inc., 494 U.S. 775 (1990).

The second applicable rule is succinctly stated by the Ninth Circuit as follows:

16

> [t]o determine whether the parties have engaged in reasonable efforts
> to reach an agreement or merely gone through the motions,
> some inquiry into the substance of the negotiations is inescapable, not to
> weigh the reasonableness of the proposals but only to determine
> whether they were of such a nature as to indicate an intention not to
> reach an agreement at all.

Horizon Air Indus., 976 F.2d at 545.  Thus, the Court must: (1) "proceed with great caution in attempting to supervise bargaining efforts," Trans World Airlines, 682 F. Supp. at 1020, (2) "refrain[] from evaluating the substantive negotiation proposals of the parties," id., and (3) resist finding violations of the RLA based solely on evidence of hard bargaining, inability to reach agreement, or intransigent positions," Horizon Air Indus., 976 F.2d at 545.  As one court has put it,

> [t]he courts are a safeguard against "merely perfunctory" compliance
> with bargaining duties, and serve, with the National Mediation Board,
> to give assurance that there has been "good faith exhaustion of the
> possibility of agreement."

Trans World Airlines, 682 F. Supp. at 1020 (quoting Am. Airlines, 169 F. Supp. at 793). See also Trans Int'l Airlines, Inc. v. Int'l Bhd. of Teamsters, 650 F.2d 949, 958-959 (9th Cir. 1980) (affirming the district court's determination that proposals described as "obstinate and unyielding" do not violate § 152, First).

In addition, "[m]ere insistence on demands that seem extremely harsh to the other side and that a neutral party may consider 'hard' is not a violation of bargaining duties." Trans World Airlines, 682 F. Supp. at 1026.  This rule has two important implications.  First, "movement toward the position of the other side is not a requirement of good faith bargaining."  Id.  Second, "[a]n employer may insist on positions . . . even if the union may consider the proposals greedy."  Id.

Moreover, "in evaluating the legality of an instance of regressive bargaining, '[w]hat

17

is important is whether [the proffered reasons for regressive bargaining] are 'so illogical' as to warrant the conclusion that the [party] by offering them demonstrated an intent to frustrate the bargaining process and there-by preclude the reaching of any agreement.'" Chicago Local No. 458-3M v. Nat'l Labor Relations Bd., 206 F.3d 22, 33 (D.C. Cir. 2000) (quoting Barry-Wehmiller Co., 271 N.L.R.B. 471, 473 (1984)).  See, e.g., Trans World Airlines, 682 F. Supp. at 1025, 1026 (stating that "[c]hanged conditions justify a hardening of bargaining posture" and that "[a] retreat . . . from more favorable offers . . . is readily explicable, and does not tend to show a picador tactic simply designed to enrage the union and bring confrontation rather than agreement"); Mead Corp. v. Nat'l Labor Relations Bd., 697 F.2d 1013, 1022 (11th Cir. 1983) (stating that "[t]he withdrawal of previous proposals or tentative agreements does not in and of itself establish the absence of good faith"). "However, withdrawal of a proposal by an employer without good cause is evidence of a lack of good faith bargaining by the employer . . . where the proposal has been tentatively agreed upon or acceptance by the Union appears to be imminent." Id.  For example, in Trans Int'l Airlines, the Ninth Circuit affirmed the finding of the district court that "the increase in the number of [union] bargaining proposals, from 61 in early 1976 to over 200 in March of 1977, was a reasonable response" to changed circumstances (a merger) and does not demonstrate bad faith.  See 650 F.2d at 958.

Further, the case law illustrates that whether the NMB has declared an impasse—thereby concluding that all reasonable efforts to reach a voluntary agreement through mediation have failed—is a factor that is relevant to, but not dispositive of, the viability of a bad faith bargaining claim.  Compare RAILWAY AND AIRLINE LABOR COMM., AM. BAR ASS'N, THE RAILWAY LABOR ACT 350-351 (Michael E. Abram et al. eds., 2d ed. 2005)

18

("[a] party need not wait until the conclusion of negotiations to bring an action under [§ 152, First]"), and Air Line Pilots Ass'n Int'l v. Transamerica Airlines, Inc., 817 F.2d 510, 513 (9th Cir. 1987) (concluding that federal courts have subject matter jurisdiction over a § 152, First claim while mediation is in progress), with Boston and Maine Corp., 664 F. Supp. at 615 n.13 (stating that "[b]ad faith bargaining usually consists of pressing nonmandatory proposals to an impasse"), and Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. World Airways, Inc.,  No. C-82-3240, 1982 WL 2109, at *4 (N.D. Cal. Aug. 20, 1982) (concluding that there was no "probability of success" on bad faith bargaining claim where "[t]he Company ha[d] complied in all respects with the desires of the [NMB] and its mediators").

Horizon Air Indus. illustrates the kind of bargaining conduct that violates § 152, First. Horizon Air Indus. involved a labor dispute between an airline and the union representing the airline's flight attendants.  See 976 F.2d at 543.  In affirming the district court's finding that the airline breached its duty to bargain in good faith, the Ninth Circuit stated as follows:

> [t]he district court found a number of [the airline's] bargaining positions evidenced "surface bargaining." [The airline's] initial proposal allowed [it] to unilaterally change any work rule at any time for any reason and required the union to recruit replacement workers during strikes; [the airline] submitted proposals less advantageous to its flight attendants than existing terms and conditions of employment; [the airline] offered proposals substantially less generous than prior proposals or than provisions included in a contemporaneous contract with its nonunion pilots.  The parties began to reach agreement only when the union gave way to [the airline's] demands or accepted proposals less favorable than the status quo.

Id. at 547.  Moreover, the district court noted numerous other instances of conduct demonstrating the airline's bad faith, some of the most egregious of which include the following: (1) the airline "printed a handbook for supervisory employees that included a

19

section on 'union avoidance,'" (2) "[the airline's] chief operating officer opposed the union's organizing campaign by declaring, 'I'll fight you every step of the way if it takes me two years, and if you strike, I'll fire and replace every damned one of you,'" (3) "[the airline] warned new flight attendants to stay away from the union," and (4) the airline "frustrated the progress of negotiations" by "refus[ing] to release flight attendant negotiators from their duties to attend negotiating sessions, even though the union offered to pay for the lost time" and "refused to meet on Mondays, Tuesdays, Friday afternoons, and weekends, and cancelled several negotiating sessions." See id. at 546.

Based on the evidence, considered cumulatively, the Ninth Circuit affirmed the district court's determination that the airline breached its duty under § 152, First to bargain in good faith.

While Horizon Air Indus. illustrates bargaining conduct that violates § 152, First, Trans Int'l Airlines and Trans World Airlines both provide examples of bargaining proposals and bargaining conduct that do not violate the duty to bargain in good faith under § 152, First. The significance of Trans Int'l Airlines has been succinctly described by the Trans World Airlines court as follows:

> The union [in Trans Int'l Airlines] was . . . making demands that the airline contended would impose costs equal to a tripling of the flight attendant payroll. The union disputed the claim that there would be a cost increase estimated to be 294% but Chief Judge Peckham found it simply "unnecessary to the resolution [of the good faith bargaining issue] to determine the actual figures. [The airline] is effectively asking the court to hold that the sheer size of the Teamsters' economic demands, and the distance between the parties after a long period of negotiations, amounts to a lack of reasonable effort by the union to reach an agreement." 96 LRRM at 2765. The district court concluded it was forbidden by "'the strong federal labor policy against governmental interference with the substantive terms of collective-bargaining agreements'" from pursuing the matter further.

20

> Judge Kennedy, on appeal, quoted the pertinent language. 650 F.2d at 958. While observing that it was not holding "that a union's insistence on proposals of the kind involved here could never be the basis for a finding that a union did not comply with its [bargaining] obligations," the appellate court concluded that the district court's finding is not clearly erroneous. Id. at 958-9.

Trans World Airlines, 682 F. Supp. at 1028-1029. Trans Int'l Airlines stands for the proposition that neither the size of one party's demands nor the "distance between the parties after a long period of negotiations" "amount to a lack of reasonable effort . . . to reach an agreement." See id. Relying on Trans Int'l Airlines, the Trans World Airlines court concluded that if

> an aggressive union may lawfully bargain for a tripling of expenses for a flight attendant group believed to be working in substandard conditions, the converse should be true, and an aggressive employer should be able to lawfully bargain for a 50% reduction in total expenses of a group believed to be considerably overpaid and much less productive than is feasible.

682 F. Supp. at 1029. Thus, the Trans World Airlines court held that the airline did not violate the RLA's good faith bargaining requirement when it bargained "for a decrease in cost of some 32%, including a 17% decrease in wages." Id.

## ii.   The Parties' Arguments

### a.   ALPA's Position

ALPA's SAC does not contain allegations that Spirit failed to meet, confer, and exchange proposals. Rather, ALPA says that Spirit violated its duty under § 152, First by going through the motions with a desire not to reach an agreement. In other words, ALPA says in its SAC that Spirit engaged in bad faith bargaining.

Specifically, ALPA alleges that the unilateral implementation of the five policy changes during the course of federally mediated bargaining, along with Spirit's bargaining

21

conduct during the September, October, and January bargaining sessions, demonstrate a "pattern and practice" of bad faith bargaining.

b.   Spirit's Response

Spirit says that its proposals and bargaining conduct are in no way "so egregious as to demonstrate a desire not to reach an agreement."  See Spirit's Rule 12(b)(6) Mot. at 11. Specifically, Spirit discusses its proposals and bargaining conduct and argues that each proposal and each instance of bargaining conduct falls well outside the purview of bad faith bargaining conduct.

First, Spirit says that its September Proposal – which, according to ALPA, would result in at least a 13.1% decrease in total pilot compensation if implemented – is well within the range of good faith bargaining conduct.  In support of its argument, Spirit says that its September Proposal is far more favorable to the union than the proposal in Trans World Airlines where the airline bargained for a 32% decrease in costs, including a 17% decrease in wages.  Spirit also points out that Trans World Airlines was decided in 1988 and argues that "if an airline can lawfully propose extensive wage reductions in normal times, then it cannot be bad faith bargaining for Spirit to propose a wage increase accompanied by other cost reductions in the present economic crisis."  See Spirit's Rule 12(b)(6) Mot. at 11.

Spirit next discusses the proposals it made during the January 2009 bargaining session.  These proposals include those relating to: (1) Spirit's right to discharge or discipline a pilot, (2) a pilot's entitlement to worker's compensation, and (3) Spirit's right to deny captain upgrades.  Spirit argues that these proposals do not demonstrate bad faith for two reasons.  First, Spirit says that they "are fundamentally unlike any held to constitute

22

bad faith," such as the proposal in Horizon Air Indus. that allowed the airline to unilaterally change any work rule at any time for any reason.  See Spirit's Rule 12(b)(6) Mot. at 13. Spirit further states that it "could have proposed far more aggressive non-economic provisions in good faith," see id. at 11, since "[m]ere insistence on demands that seem extremely harsh to the other side and that a neutral party may consider 'hard' is not a violation of bargaining duties."  See Trans World Airlines, 682 F. Supp. at 1026.  Second, Spirit says that the proposals made during the January 2009 bargaining session do not evince bad faith because it presented its proposals as negotiable.  According to Spirit, its willingness to negotiate demonstrates good faith especially because the RLA does not require it to modify particular terms.  See, e.g., Trans World Airlines, 682 F. Supp. at 1026 ("movement toward the position of the other side is not a requirement of good faith bargaining").

Next, Spirit argues that its demand for additional cost reductions during the September 2008 and January 2009 bargaining sessions do not evince bad faith bargaining because its demand was motivated by changed circumstances, namely, increased fuel prices and the continued deterioration of the local and national economies, respectively. Spirit cites cases in which courts have determined that changed circumstances justify increased demands.  Spirit also asks the Court to take judicial notice of the fact that (1) the Dow Jones Industrial Average fell from 11,019.69 to 7,949.05 between the dates of its September 2008 and January 2009 proposals and (2) six U.S. airlines have gone out of business and two others have gone bankrupt since the parties have commenced negotiations over a new CBA.  Spirit says that its "cost-cutting proposals are aimed at the very survival of the Company, which ultimately is in the interest of its employees, and are

23

in line with reductions taking place across the country." See Spirit's Rule 12(b)(6) Mot. at 15-16.

Spirit also argues that a finding of bad faith in this case would require the Court to pass judgment on the various bargaining positions proposed by the parties, which is a forbidden undertaking. Spirit cites Horizon Air Indus. for the proposition that the Court may not "weigh the reasonableness of the proposals" and argues that an order restraining Spirit from engaging in bad faith bargaining would be "tantamount to ordering Spirit to agree to specific terms." See Spirit's Rule 12(b)(6) Mot. at 17.

Finally, Spirit argues that if ALPA can sustain a claim under the RLA, so can it. As stated by Spirit,

> [g]iven the global economic crisis and the fragile state of the airline industry, Spirit would allege that ALPA's demands for increased compensation — at a time when other employers are cutting costs — reflect ALPA's own desire not to reach agreement. Spirit could then request the same thing as ALPA: that the Court dictate contract terms. But that is precisely the kind of judicial interference that the RLA forbids, and also why this Court should dismiss ALPA's claim.

Id.

### c. ALPA's Counter Arguments

In response, ALPA argues that its SAC states a plausible claim for relief under § 152, First and advances a number of arguments in support of that position. First, ALPA says that Spirit has not been honest with it regarding the reasons for Spirit's regressive bargaining proposals. ALPA states that Spirit represented at one time that the September Proposal contained a pay increase but later admitted that the proposal actually cut total pilot pay. ALPA also says that Spirit was dishonest when it blamed its regressive bargaining proposals on the increase in the price of fuel given that it refused to temper its

24

bargaining positions later on when the price of fuel dropped.

Second, ALPA argues that Spirit's bargaining conduct during the January 2009 bargaining session demonstrates bad faith because Spirit "summarily reneged on every single [tentative agreement] reached during the first two years of bargaining."  See ALPA's Resp. to Spirit's Rule 12(b)(6) Mot. at 14.  ALPA says that the "vast majority of the [tentative agreements] Spirit repudiated embodied long-standing previously uncontroversial commitments between the parties," see id., and that "Spirit's attempt to justify its reversal of these issues solely by making general references to the national economy does not evidence good faith bargaining" given that "most of the [tentative agreements on which Spirit reneged] pertain[] to non-economic matters."  See id.

Third, ALPA argues that Spirit's demands are "unpalatable," and therefore proffered in bad faith, because they impose at-will employment conditions on pilots and create "illusory" terms.  See id. at 16.  ALPA states that "[t]here is no precedent at Spirit or in any other pilot agreement for the breadth of management control and discretion it now demands," see id. at 15, and that "Spirit is demanding a degree of unfettered managerial discretion over pay and working conditions which does not exist in any other pilot agreement in the industry."  See id.  Moreover, ALPA says "the agreement demanded by Spirit would leave pilots with almost none of the basic administrative rights and protections enjoyed in the current Spirit CBA and by every other represented pilot group in the United States" and that this "is powerful evidence that [Spirit] is engaged solely in the pretense of bargaining and has no genuine desire to bridge differences and reach a real agreement."  See id.  ALPA states in its brief that Kane has told Spirit on three occasions that Spirit's proposals are not a basis for an agreement.

25

Finally, ALPA reiterates that it is not asking the Court to pass judgment on Spirit's proposals, but rather asking the Court to consider the totality of Spirit's bargaining conduct and conclude that the allegations in the SAC "clearly establish[] at least the plausibility of its bad faith bargaining claim." See id. at 18. ALPA says that "the bargaining process has already broken down" and that "[j]udicial intervention to restore the integrity of the RLA bargaining process is authorized and imperative." See id. at 17.

### iii.   Resolution

After carefully considering the allegations contained in ALPA's SAC, the Court finds that ALPA does not state a plausible claim for relief under § 152, First. That is, viewing the SAC in the light most favorable to ALPA and accepting all of its factual allegations as true, ALPA is not entitled to the relief it seeks. The Court addresses each instance of purported bad faith bargaining, and each of ALPA's arguments, in turn, below.

### a.   Spirit's Regressive Proposals

ALPA first argues that Spirit's regressive proposals evidence bad faith. ALPA says that "Spirit demanded highly regressive contract terms without any explanation or justification . . . or ones that have not always been honest" and states that the justifications given by Spirit are "highly suspect." See ALPA's Resp. to Spirit's Rule 12(b)(6) Mot. at 14.

According to the SAC, Spirit justified its demands during the September bargaining session by referencing the increased price of fuel. See SAC at ¶¶ 84, 87, 89. ALPA says that this justification was dishonest given Spirit's later refusal to temper its bargaining position when the price of fuel dropped. With regard to Spirit's January 2009 Proposal, ALPA states in its SAC that Spirit justified its regressive bargaining position by referencing the deteriorating state of the national and local economies. See id. ¶ 108. The SAC itself

26

acknowledges two reasons given by Spirit for its regressive bargaining positions.  Thus, ALPA's assertion that "Spirit demanded highly regressive contract terms without any explanation" is not supported by its own SAC.

Moreover, even if those reasons are "highly suspect" or "dishonest," as ALPA says, that is not the standard employed to determine the legality of an instance of regressive bargaining.  "[I]n evaluating the legality of an instance of regressive bargaining, '[w]hat is important is whether [the proffered reasons for regressive bargaining] are 'so illogical' as to warrant the conclusion that the [party] by offering them demonstrated an intent to frustrate the bargaining process and there-by preclude the reaching of any agreement.'" Chicago Local No. 458-3M, 206 F.3d at 33 (quoting Barry-Wehmiller Co., 271 N.L.R.B. at 473).  The Court takes judicial notice of the fluctuating oil prices and the repressed state of the economy during the relevant time period and concludes that under no circumstances do the reasons offered by Spirit rise to the required level of "illogical."  Notably, ALPA does not make that argument in its brief.

### b.  Withdrawal of Tentative Agreements

ALPA argues that Spirit "summarily reneged on every single [tentative agreement] reached during the first two years of bargaining," even those pertaining to non-economic matters.  ALPA says this evinces bad faith bargaining.  In support of its argument, Spirit cites Mead Corp. for the proposition that "withdrawal of a proposal by an employer without good cause is evidence of a lack of good faith bargaining by the employer . . . where the proposal has been tentatively agreed upon."  As Spirit points out, however, ALPA has mischaracterized the holding of the Mead Corp. court by omitting important language.  In reality, what the Mead Corp. court said was this:

27

> The withdrawal of previous proposals or tentative agreements does not in and of itself establish the absence of good faith. NLRB v. Randle-Eastern Ambulance Service, Inc., supra at 725. However, withdrawal of a proposal by an employer without good cause is evidence of a lack of good faith bargaining by the employer . . . where the proposal has been tentatively agreed upon or acceptance by the Union appears to be imminent.

697 F.2d at 1022 (emphasis added). This rule does not apply in the present case. Mead Corp. dealt with a situation where the employer "withdrew a proposal . . . knowing that acceptance of the proposal by the Union was imminent." Id. at 1016 (emphasis added). The facts alleged here are very different: Spirit withdrew tentative agreements, not an entire proposal, and even if Spirit did withdraw an entire proposal, which it did not, ALPA does not allege that the proposal was tentatively agreed upon or that acceptance was imminent. In fact, it alleges the opposite – that "it did not view the September Proposal as a good faith attempt to bring about agreement." See SAC at ¶ 88. Thus, Mead Corp. is inapplicable here.

c.  The January 2009 Proposal and Spirit's Purported "Unpalatable" Demands

ALPA alleges all of the following with respect to Spirit's January 2009 Proposal: (1) that it contains concessions valued at over $5.8 million, a $1.3 million increase from the concessions demanded at the September 2008 bargaining session, (2) that Spirit proposed a change that would allow it to discipline or discharge a pilot, "in its discretion," "for just cause" (whereas the previous language stated that a pilot "will not be disciplined without just cause"), (3) that Spirit proposed a change to a clause concerning worker's compensation that would entitle a pilot to worker's compensation so long as he is unable to perform "any" job as opposed to his "own" job, and (4) that Spirit proposed a change to a clause concerning pilot upgrades from that would allow Spirit to deny captain upgrades

28

if the Company-chosen Chief pilot questions the pilot's leadership, competency, or reliability.

The Court cannot, and will not, evaluate these substantive negotiation proposals or weigh their reasonableness.  See Trans World Airlines, 682 F. Supp. at 1020; Horizon Air Indus., 976 F.2d at 545.  The Court only notes that they do not come close to the kind of bargaining positions that have been held to evince bad faith bargaining under § 152, First.  With regard to (1), above, see Trans World Airlines, 682 F. Supp. at 1029 (the airline did not violate § 152, First when it bargained "for a decrease in cost of some 32%, including a 17% decrease in wages").  With regard to (1) – (4), above, see Horizon Air Indus., 976 F.2d at 547 (determining that the airline engaged in "surface bargaining" when it, among numerous other things, demanded that it be allowed "to unilaterally change any work rule at any time for any reason"); Trans World Airlines, 682 F. Supp. at 1026 ("[m]ere insistence on demands that seem extremely harsh to the other side and that a neutral party may consider 'hard' is not a violation of bargaining duties" and "[a]n employer may insist on positions . . . even if the union may consider the proposals greedy").

The Court acknowledges ALPA's argument that many of the cases discussed in this Memorandum do not involve determinations made at the Rule 12(b)(6) stage of the proceedings.  However, the Court has thoroughly reviewed the SAC and finds that even if all of the allegations are true, they simply do not rise to the level of a plausible RLA violation.  Dismissal is therefore warranted.

Finally, the Court notes that mediation before the NMB is currently in progress and no impasse has been declared by the mediator.  Although this fact is certainly not dispositive of ALPA's bad faith bargaining claim, it is a factor that weighs in Spirit's favor.

29

Based on the Court's reading of the applicable authorities, it is more difficult, though not impossible, to sustain a bad faith bargaining claim while mediation is ongoing.  Therefore, the conclusion that ALPA's allegations are insufficient to invoke the intervention of this Court is reinforced by the fact that mediation between the parties is ongoing.

2.   Count Two - Violation of ALPA's Organizational Rights

i.   Law

The right of employees to organize under the RLA is codified at 45 U.S.C. § 152, Third and Fourth.  Section 152, Fourth, states that "[e]mployees shall have the right to organize and bargain collectively through representatives of their own choosing."  Section 152, Third, states that "[r]epresentatives . . . shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives."

As Spirit correctly notes, the Supreme Court has determined that the right to organize under §152, Third and Fourth, concerns "primarily the precertification rights and freedoms of unorganized employees."  See Trans World Airlines, Inc., 489 U.S. at 440.  As explained by the Supreme Court,

> [s]ection 2 Fourth was enacted as part of the 1934 amendments to the RLA.  From the time of our very first opportunity to interpret the 1934 amendments, we have viewed them as addressing primarily the precertification rights and freedoms of unorganized employees.  In Virginian R. Co. v. Railway Employees, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937), we observed that the employees' freedom "to organize and to make choice of their representatives without the 'coercive interference' and 'pressure' of a company union . . .  was continued and made more explicit by the amendment of 1934."  In Switchmen's v. National Mediation Bd., 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), the Court divided over whether the federal courts

30

have jurisdiction under § 2 Fourth to review a certification of union
representatives for collective bargaining by the National Mediation
Board acting under § 2 Ninth of the RLA as amended in 1934.  Both
the majority and the dissent agreed, however, that "[t]he 1934 Act was
directed particularly at control over the initial step in collective
bargaining-the determination of the employees' representatives."

Id. at 440-441 (citations omitted).  See also Local Union No. 2000, Int'l. Bhd. of Teamsters,

AFL-CIO v. Northwest Airlines, Inc., 21 F. Supp.2d 751, 755 (E.D. Mich. 1998) (section

152, Third and Fourth "are designed to protect the rights of employees and unions in the

context of a campaign to certify a bargaining representative, or to replace an existing

bargaining representative").

The Sixth Circuit has not definitively determined whether a claim under § 152, Third

and Fourth is cognizable outside the precertification context.  However, in Int'l Bhd. of

Teamsters v. United Parcel Svc. Co., 447 F.3d 491, 502 (6th Cir. 2006), the Sixth Circuit

stated that if such a claim is cognizable, "federal-court jurisdiction over [such] actions . . .

remains 'extremely limited.'"  Id.  See also Wightman v. Springfield Terminal Ry. Co., 100

F.3d 228, 234 (1st Cir. 1996) ("intervention in a post-certification dispute under §§ 152,

Third and Fourth will occur in extremely limited circumstances"); Northwest Airlines, Inc.,

21 F. Supp.2d at 755 (§ 152, Third and Fourth apply in the post-certification context "only

[in] a limited set of circumstances"). The Sixth Circuit has noted that

> [s]ome lower courts have recognized that even if a dispute arises in
> the representation [i.e. in the post-certification context] . . . federal
> courts may theoretically have jurisdiction under § 2, Third and Fourth,
> if there is evidence of "carrier conduct reflecting anti-union animus,
> . . . discrimination, or coercion" or when "a carrier commit[ed] acts
> of intimidation that c[ould not] be remedied by administrative means, or
> commit[ed] a fundamental attack on the collective bargaining process
> or ma[de] a direct attempt to destroy a union."

United Parcel Svc. Co., 447 F.3d at 502 (citations omitted).  Thus, facts "demonstrat[ing]

31

sharp bargaining practices . . . in an effort to gain [a] competitive advantage," or

"competitive jockeying," "notably fail to demonstrate [anti-union] animus or a fundamental

attack on the bargaining process." Wightman, 100 F.3d at 234. See also Northwest

Airlines, Inc., 21 F. Supp.2d at 755 ("the level of anti-union animus required to justify

federal court intervention in post-certification disputes is substantial").

ii.   The Parties' Arguments

Here, ALPA says that Spirit violated its right to organize under § 152, Third and

Fourth, as follows:

> During pending federally mediated bargaining . . . Spirit is engaging
> in a continuing pattern and practice both of intentional interference
> with pilots' organizational rights and of conduct intended to undermine,
> subvert and destroy ALPA's standing and effectiveness as the pilots'
> exclusive bargaining representative. [Spirit] has repeatedly, and
> unilaterally, terminated or modified essential contractual protections
> for Spirit pilots, disregarding ALPA, the pilots' statutory representative,
> and bypassing the collective bargaining process. [Spirit] has
> attempted, and continues to attempt, to harass, coerce and intimidate
> Spirit pilots into acquiescing to violations of the CBA, including flying
> sick and flying past their furlough effective date. [Spirit] repeatedly
> has changed the facts on the ground, unilaterally imposing
> modifications to the terms of the CBA, in an attempt to gain an unfair
> advantage and leverage in future bargaining.   And, [Spirit] has
> repeatedly set forth unexplained or unjustified, highly regressive and
> concessionary Proposals, including elimination without corresponding
> economic benefit to the Company of numerous fundamental
> contractual rights for Spirit pilots that pilots throughout the industry
> enjoy, leaving ALPA powerless to protect pilots' interests and making
> a mockery of the bargaining process.  Said actions form a continuing
> pattern and practice of intentional conduct, undertaken to intimidate
> and coerce Spirit pilots, to interfere with Spirit pilots' organizational
> rights, and to subvert and destroy the RLA's collective bargaining
> process and ALPA's effectiveness and standing with the unlawful
> purpose of attempting to marginalize ALPA and call into question its
> ability to timely defend and protect the pilots' rights and, thereby,
> alienate Spirit pilots from the collective bargaining process and, ALPA,
> their chosen bargaining representative . . . .

32

SAC at ¶ 131.

Spirit argues that ALPA's SAC fails to state a claim under § 152, Third and Fourth. Spirit points out that § 152, Third and Fourth primarily address precertification rights and freedoms of unorganized employees and argues that ALPA's allegations are insufficient to trigger any arguable limited jurisdiction under § 152, Third and Fourth outside the precertification context. Spirit further says that "no courts appear to have considered the question whether a party's bargaining proposals could constitute an attempt to destroy a union." <u>See</u> Spirit's Rule 12(b)(6) Mot. at 19.

ALPA, on the other hand, argues that it states a plausible claim under § 152, Third and Fourth. In support of its position, ALPA cites <u>Chicago & N. W. Ry. Co.</u>, 402 U.S. at 575, for the proposition that "the duty of management to bargain in good faith is essentially a corollary of its duty to recognize the union" and argues that "[w]here . . . management is refusing to bargain in good faith, it is essentially refusing to recognize the Union." <u>See</u> ALPA's Resp. to Spirit's Rule 12(b)(6) Mot. at 19.

### iii.   Resolution

After carefully considering the allegations in ALPA's SAC, the Court concludes that ALPA is attempting to shoehorn its § 152, First claim into a claim under § 152, Third and Fourth. ALPA states in its SAC that it is "a 'representative' as defined [by the] RLA" and "the duly authorized, recognized and certified collective bargaining representative under the RLA and under the Spirit-ALPA collective bargaining agreement for all pilots employed by Spirit." SAC at ¶ 7. Therefore, as the SAC itself makes clear, this case does not involve the precertification rights of unorganized employees; rather, it involves the post-certification rights of an organized group of employees.

33

Moreover, ALPA alleges no facts which could support a plausible claim that Spirit engaged in conduct reflecting anti-union animus or made a direct attempt to destroy ALPA. Nor does the SAC contain facts reflecting any discriminatory, coercive, or intimidating actions toward ALPA. As Spirit notes, and the Court agrees, "[c]ourts have refused to exercise jurisdiction in situations where the allegations were much more egregious than here." See, e.g., Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists and Aerospace Workers, 915 F.2d 43, 53 (1st Cir. 1990) (determining that "the disciplinary investigation of the three Union representatives . . . even if unjustified, does not approach the kind of extraordinary anti-union animus" necessary to trigger jurisdiction over a § 152, Third and Fourth claim). ALPA cites no case, and the Court knows of none, in which a court has entertained a § 152, Third or Fourth action on facts similar to those alleged here.

## VI.   Order

Spirit's Rule 12(b)(6) motion is GRANTED. This case is DISMISSED WITHOUT PREJUDICE.

## Coda

Nothing said in this Memorandum and Order should be taken as stating that the Court does not have a role in a RLA collective bargaining situation. The first stage in such a negotiation involves the parties alone. The second stage involves mediation overseen by a federal mediator. The third stage is self-help. This step has a substantial adverse affect on the traveling public. Therefore, success at the second stage is an imperative.

As the Court reads the RLA, its role is to assure that success at the second stage is not impeded by the absence of good faith on the part of any of the parties. When good faith appears to wane or disappear, the Court then has a role. As the Court reads the

papers in this case, this has not yet happened.  Accordingly, the case is dismissed without prejudice.  The Court may yet have a role; only time will tell.

SO ORDERED.


 S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  June 18, 2009


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, June 18, 2009, by electronic and/or ordinary mail.


 S/Julie Owens
Case Manager, (313) 234-5160